In re WULZEN.

In re DOYLE.

(District Court S. D. Ohio, E. D.   August 25, 1916.)

Nos. 1846, 1847.

1. HABEAS CORPUS ⬤⟿94—SCOPE OF INQUIRY—ARREST UNDER CITY ORDINANCE.
    In habeas corpus to determine jurisdiction of state courts, as opposed
    to military courts, to try offenses by members of the military, the fact
    that an arrest is under a city ordinance is immaterial, if the ordinance is
    valid.
    [Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. §§ 82, 92;
    Dec. Dig. ⬤⟿94.]

2. HABEAS CORPUS ⬤⟿45(2)—WHEN WRIT MAY ISSUE.
    The power to issue writ of habeas corpus under Rev. St. § 753 (Comp.
    St. 1913, § 1281), is to be sparingly exercised, especially when directed
    toward release of members of the military accused of offenses against
    the peace of the state; the jurisdiction of the civil courts of the state
    over such offenses in time of peace being admitted.
    [Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. §§ 38–45;
    Dec. Dig. ⬤⟿45(2).]

3. CONSTITUTIONAL LAW ⬤⟿68(1)—EVIDENCE ⬤⟿48—JUDICIAL NOTICE—STATE
    OF WAR—POLITICAL QUESTIONS.
    The existence of a condition of war must be determined by the politi-
    cal department of the government, and the courts will take judicial notice
    of such determination and are bound thereby.
    [Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 125;
    Dec. Dig. ⬤⟿68(1); Evidence, Cent. Dig. § 70; Dec. Dig. ⬤⟿48.]

4. HABEAS CORPUS ⬤⟿45(4)—SCOPE OF INQUIRY—JURISDICTION OF FEDERAL
    COURTS.
    Under the Habeas Corpus Act (Comp. St. 1913, §§ 1279–1293), a federal
    court may issue a writ of habeas corpus to inquire into the cause of de-
    tention of a prisoner held by a state on a criminal charge, if the petition-
    er alleges that the alleged offense was committed in the performance of
    his duty as a soldier of the United States, and the court may determine
    summarily whether such allegation is true, and, if true, may discharge
    the prisoner on the ground that the state court is without jurisdiction.
    [Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. §§ 38–45;
    Dec. Dig. ⬤⟿45(4); Courts, Cent. Dig. §§ 804, 805.]

5. ARMY AND NAVY ⬤⟿3—STATE AND FEDERAL COURTS—JURISDICTION—OF-
    FENSES BY THE MILITARY.
    If military authorities have the right to try members of the military for
    violations of state law or municipal ordinances, it is by virtue of a federal
    law, and if there is such a law it is paramount; nor does it deprive citi-
    zens of any rights under state law.
    [Ed. Note.—For other cases, see Army and Navy, Cent. Dig. § 6; Dec.
    Dig. ⬤⟿3.]

6. ARMY AND NAVY ⬤⟿3—STATE AND FEDERAL COURTS—JURISDICTION—OF-
    FENSES BY THE MILITARY.
    Although military authorities may have priority to try alleged offenses
    against state law or municipal ordinances, it does not necessarily follow

that the victims of such offenses may not by proceedings in the state courts secure redress.

[Ed. Note.—For other cases, see Army and Navy, Cent. Dig. § 6; Dec. Dig. ☞3.]

7. ARMY AND NAVY ☞3—STATE AND FEDERAL COURTS—JURISDICTION—OFFENSES BY THE MILITARY.

If a member of the military is charged with disorderly conduct in violation of a municipal ordinance, a paramount remedy is provided for by punishment by the military authorities.

[Ed. Note.—For other cases, see Army and Navy, Cent. Dig. § 6; Dec. Dig. ☞3.]

8. ARMY AND NAVY ☞3—STATE AND FEDERAL COURTS—JURISDICTION—OFFENSES BY THE MILITARY.

Where, during mobilization of state militia, at the time of the Mexican trouble, a company of soldiers marching to a meeting for the purpose of encouraging enlistments pushed its way through the crowd there gathered, but it is not shown that it was done violently, or that the prosecuting witness was even touched, or that there was malice, wantonness, or criminal intent, the military authorities, and not the state courts, have authority to try members of the company for such alleged breaches of the peace.

[Ed. Note.—For other cases, see Army and Navy, Cent. Dig. § 6; Dec. Dig. ☞3.]

Habeas Corpus. Applications by Wesley G. Wulzen and by Tester Doyle to secure release from custody under state court process. On final hearing. Petitioners discharged.

Turney, Olds & Sipe, of Cleveland, Ohio (Hubert J. Turney, Advocate General, of Cleveland, Ohio, of counsel), for petitioners.

J. W. Sharts, of Dayton, Ohio, for arresting officer.

SATER, District Judge. [1] In each of the cases before me the prayer is for a writ of habeas corpus. One is brought to secure the release of Captain Wulzen, who has been arrested on the charge of disturbing the peace, good order, and quiet of the city of Hamilton, by applying abusive and indecent language to Charles Baker, contrary to the form of an ordinance of that city. The fact that the arrest is under an ordinance is immaterial, if the ordinance is valid. The other case is brought for the discharge of Sergeant Doyle, who has also been arrested, the charge against him being an unlawful attempt to provoke Baker to commit a breach of the peace, by striking him with his hand, contrary to the form of the statute. Each of the petitioners denies guilt, and avers that he is unlawfully and actually imprisoned and restrained of his liberty, and detained without legal authority, in the custody of Charles J. Norris, bailiff of the municipal court of the city of Hamilton.

Both of the petitioners are officers of the military forces of the United States.[1] On or about the 18th of June the President called

[1] On July 1, 1916, Congress adopted a resolution which, in as far as need be noted, provides: "That in the opinion of the Congress of the United States an emergency now exists which demands the use of troops in addition to the Regular Army of the United States, and that the President be, and he is

for the mobilization of the National Guard of the United States. One of the petitioners was an officer in the Guard at that time. The other, having formerly been a member of the regular army, re-enlisted. Prior to June 22, both took the oath prescribed by section 70 of the act of Congress passed June 3, 1916. To bring the company up to the requisite number, enlistments were solicited, to which there appears to have been at Hamilton certain opposition. A public meeting was held on the evening of June 22, in the courthouse square, for the purpose of considering the situation that then confronted this country —an impending war with Mexico—and to encourage the enlistment of recruits. Some addresses were delivered on that occasion. The company to which these two men belonged, in military formation, were marching to the place of meeting for the purpose of assisting and participating in it. One of them was acting as guide. Some of the persons assembled pressed forward, so as to obstruct the march of the company of which the petitioners were members, and were pushed back that the company might pass. The evidence does not disclose that this was done with violence. The situation was such as frequently occurs in any city where there is a parade of fraternal orders, or of policemen, or of the military, and those in charge find it necessary to clear or widen the passageway. The evidence goes to show that if Baker, who filed complaints with the Hamilton magistrate against the petitioners, was one of the parties pushed back, it was not known at that time by either of the petitioners, or that any malice or feeling was manifested towards him. There was some conversation between him and one of the petitioners, but as detailed here it was innocent.

It is charged that Baker, following the President's order for mobilization, had issued and distributed through the mails scurrilous and treasonable matter to deter enlistments and to prevent obedience to such order, and that his purpose in causing the arrest of the peti-

hereby, authorized to draft into the military service of the United States, under the provisions of section one hundred and eleven of the National Defense Act, approved June third, nineteen hundred and sixteen, so far as the provisions of said section may be applicable and not inconsistent with the terms hereof, any or all members of the National Guard and of the Organized Militia of the several states, territories, and the District of Columbia, and any and all members of the National Guard and Organized Militia Reserves, to serve for the period of the emergency, not exceeding three years, unless sooner discharged," etc. Section 111, in so far as pertinent, is as follows: "When Congress shall have authorized the use of the armed land forces of the United States, for any purpose requiring the use of troops in excess of those of the Regular Army, the President may, under such regulations, including such physical examination, as he may prescribe, draft into the military service of the United States, to serve therein for the period of the war unless sooner discharged, any or all members of the National Guard and of the National Guard Reserve. All persons so drafted shall, from the date of their draft, stand discharged from the militia, and shall from said date be subject to such laws and regulations for the government of the Army of the United States as may be applicable to members of the Volunteer Army, and shall be embodied in organizations corresponding as far as practicable to those of the Regular Army or shall be otherwise assigned as the President may direct."

tioners was to embarrass the United States and the military department by interfering with these officers. A consideration of this feature is not necessary in disposing of the cases. On the same evening complaint was lodged by Baker with a local magistrate. Some effort was subsequently made to arrest the petitioners. The military authorities at first resisted the efforts to arrest, but subsequently the commanding officer, following the transfer of their company and regiment, as well as other regiments, to Columbus, Ohio, where they are and have been training for actual service, ordered the surrender of Wulzen and Doyle, if the state authorities came after them. In the meantime, charges were preferred against them preparatory to their trial by military authorities, and they also invoked action by the military court to establish their innocence of wrongdoing. Both proceedings are pending. There is no evidence that such proceedings have been unduly delayed, or that the accused will not be punished, if they deserve it. Both are doing, and for some time past have been engaged in, provost duty.

[2, 3] Shall the prisoners be released, or shall the state retain them? Section 755, Rev. St. U. S. (Comp. St. 1913, § 1283), provides for a speedy hearing of an application for a writ of habeas corpus. If the writ may issue, it is under section 753, Rev. St. U. S. (Comp. St. 1913, § 1281). The power to grant the writ is to be sparingly exercised. The general jurisdiction in time of peace of the civil courts of a state over persons in the military service of the United States, who are accused of a capital crime or of any offense against the person of a citizen, committed within the state, is not denied. Drury v. Lewis, 200 U. S. 7, 26 Sup. Ct. 229, 50 L. Ed. 343. Whether there is a state of war existing now, or whether it existed on the 22d day of June, need not be decided. A definition of "war" is found in the Prize Cases, 67 U. S. (2 Black) 666, 17 L. Ed. 459. The existence of a condition of war must be determined by the political department of the government, and the courts will take judicial notice of such determination and are bound by it. Hamilton v. McClaughry, 136 Fed. (C. C.) 445, 449.

[4] Jurisdiction exists to hear these cases. Under the Habeas Corpus Act, a federal court has power to issue a writ of habeas corpus for the purpose of an inquiry into the cause of detention of a prisoner held by a state to answer to a criminal charge, where it is alleged by the petitioner that the act charged as a crime was committed by the prisoner in the performance of his duty as a soldier of the United States. It has authority to determine summarily, as a fact, whether or not such allegation is true, and, if found to be true, to discharge the prisoner on the ground that the state is without jurisdiction to try him for such act. U. S. v. Lipsett (D. C.) 156 Fed. 65.

[5, 6] The writ should issue only in urgent cases. I have endeavored to find out what have been regarded by the courts as urgent cases. In Stegall v. Thurman (D. C.) 175 Fed. 813, it appears that a storekeeper and gauger in the Internal Revenue Department refused to divulge information in regard to the business of a distillery, which in-

formation had been obtained by him in his official capacity as an internal revenue officer. His refusal extended down to and included the time when he was called as a witness in court. He was acting under a regulation of the Internal Revenue Department. It was held to be an urgent case, and jurisdiction was entertained; he was released on a writ of habeas corpus.

In Boske v. Comingore, 177 U. S. 459, 20 Sup. Ct. 701, 44 L. Ed. 846, it was shown that a person was arrested, and discharged on a writ of habeas corpus later, because he was acting under a rule of the department and his arrest would have interfered with the discharge of his duties, his presence at his post of duty being important to the public interests. The petitioner in that case had refused to give up certain records and information in his possession. In Ohio v. Thomas, 173 U. S. 276, 277, 19 Sup. Ct. 453, 43 L. Ed. 699, it was held that federal officers who were discharging their duties in the state (Ohio), and who were engaged in superintending the internal government and management of a federal institution, the Soldiers' Home at Dayton, under the lawful direction of its board of managers and with the approval of Congress, were not subject to the jurisdiction of the state in regard to matters of administration approved by federal authority. The officers there were acting under federal power. There is still another case—In re Turner (D. C.) 119 Fed. 231—in which an inferior officer, acting in obedience to orders of the Secretary of War, who was executing an act of Congress, was arrested and discharged on a writ of habeas corpus.

In each of these cases a discharge was granted, for the reason that prosecution by the state authorities would interfere with the administration of federal duties. None of them was more urgent than the instant cases. The petitioners on June 22 were acting, and ever since have been acting, under orders of the President in the discharge of a high duty, and may be ordered at any time to the Mexican border to perform active military service. Who has the right to try these men, if an offense was committed—the state or the military authorities? If the military authorities have the right, it is by virtue of a federal law, not of custom. If there is such a law, it is paramount, and the enforcement of it will not deprive any citizen of any right under the state law.

We have a national bankruptcy law. We also have a state assignment law, which is local and operative only in the state of Ohio; but the bankruptcy law supersedes the state law in the administration of a bankrupt's estate. If an insolvent person finds his way by deed of assignment into the probate court of any county, even if his estate might be as well or even better administered in that court, it cannot be kept there, if later a proper proceeding in bankruptcy is commenced in the federal court. We have laws, both state and federal, relating to safety appliances, to boiler inspection, and to employers' liability in case of accident by interstate carriers. Proceedings under the state statute may be had (in cases properly arising) in the state courts; but where the same ground is covered by the federal law, it takes

precedence. Three judges, sitting together in this court, held that the inspection of locomotive boilers used in interstate commerce must be under the federal and not the state law. Twice the Circuit Court of Appeals of this circuit has held that a state compensation act for the benefit of persons injured in the course of their employment must yield, if a person working for a railroad elects to prosecute his suit for personal injury under the federal statute in the federal courts, and for the simple reason that the federal law is paramount. Grand Trunk Ry. Co. v. Knapp, 233 Fed. 950, —— C. C. A. ——; Waters v. Guile, 234 Fed. 532, —— C. C. A. ——. It does not necessarily follow, if the military authorities have priority here, that some sort of a proceeding in a proper way may not yet be maintained in the state courts as to these two petitioners; but that question is not before us, and need not be decided.

[7] In Re Schlaffer (D. C.) 154 Fed. 921, 923, a soldier was arrested under a city ordinance, convicted, and punished. The offense charged was urinating on the sidewalk. It was said that, if soldiers should become drunk and disorderly, even while on leave, they are liable to punishment under the rules of war, although it be a time of peace, and it is not considered that they should be treated and held in any detention or attempted punishment, the same as if they were answerable to no other power. Their position and the requirements of their constant duty demand, in behalf of the national government, from the municipal (and, it may be added, state) authorities, such a recognition of its rights as would accomplish a preservation of the peace and the observance of the city ordinances (and state laws) as would in no way affect their duties as soldiers. Under the circumstances of that case, a writ of habeas corpus was permitted to go. It follows that, if the charge here was disorderly conduct, there is a remedy provided for punishment by the military authorities, which remedy is paramount and should be exercised by those authorities rather than by the municipality or the state.

My attention was called to the case in 1 Utah, at page 145. An ordinance against drunkenness and disorderly conduct was involved. A writ of habeas corpus issued, because the parties were subject to punishment by the military authorities, who had the prior right. In the case of U. S. v. Fuellhart (C. C.) 106 Fed. 911, a man was arrested for taking another into custody or arresting him when he had no warrant. That was an offense under the law of the state in which he aided in making the arrest; but he was released on a writ of habeas corpus. The arrests from which relief is here sought do not appear to me to be better founded than those above mentioned.

[8] Judge Knappen, now one of our Circuit Judges, in the above-mentioned Lipsett Case (D. C.) 156 Fed. 65, 69, 70, reviews certain other cases and has made the decision here comparatively easy. He quotes with approval In re Lewis (D. C.) 83 Fed. 159, and In re Fair (C. C.) 100 Fed. 149. In the Lewis Case evidence was taken, as in this. The use to be made of such evidence is stated by Judge Knappen (156 Fed. 69) to be not for the purpose of determining wheth-

er the prisoner should be found guilty or innocent, but of determining whether the act alleged to be criminal was done in the performance of duty in the service of the United States.

In the Lewis Case it is stated that an officer, who, in the performance of what he conceives to be his official duties, transcends his authority and invades private rights, he is answerable therefor to the government under whose appointment he acts and to individuals injured by his action; but, where there is no criminal intent, he is not liable to answer the criminal process of another government. It was further held in that case that the federal courts have authority in habeas corpus proceedings to inquire into the guilt or innocence of persons committed on preliminary examination by a state tribunal on a criminal charge for acts done in the service of the United States, so far as to determine whether the acts were done wantonly and with criminal intent; if not so done, the release must follow. That statement is quoted in extenso by Judge Knappen and approved.

In the Fair case, the gist of the decision is that the government of the United States and of a state, though exercised within the same territory, occupy different planes, and the criminal laws of the one have no application to acts performed under the authority of the other in respect to matters solely within its control, and that an officer or agent of the United States, who does an act which is within the scope of his authority as such officer or agent, cannot be held to answer therefor under the criminal laws of another and different government. In that case the person who was arrested was acting under the orders of an officer in command; the officer told the petitioner, who was a private, to perform a certain act. It was his duty to perform it, unless it was so clearly wrong that a man of ordinary sense and understanding would know, when the order was given, that it was illegal.

These men now before the court were in the employ of the United States as soldiers. They were mobilizing. They were in the discharge of their duty in endeavoring to get recruits. There is no evidence here of malice, wantonness, or criminal intent. Under the rulings made in the last three cases mentioned, the state is not entitled to priority. Indeed, it is not shown that any violence was done to Baker, or that he was even touched, when the crowd was pressed back from the course of the marching troops.

Running through the cases, by whatever courts decided, is the question as to what the effect will be of seizing federal officers and withholding them from the performance of their duty to the government. One of the cases best considered and much relied upon is that of In re Waite (D. C.) 81 Fed. 359. The decision rendered by Judge Shiras in that case was approved by the Circuit Court of Appeals, and was cited with approval by the Supreme Court of the United States in Ohio v. Thomas, 173 U. S. 284, 19 Sup. Ct. 453, 43 L. Ed. 699. Judge Shiras employed this language (81 Fed. 365, 366):

"If, however, it should be held that the officers of the United States, when engaged in the performance of their official duties, can be arrested by a warrant from a state magistrate, or from a court of record of the state, upon

the charge that in the performance of the duties imposed upon him the officer has violated some provision of the state statutes, it is apparent that the enforcement of the laws of the United States and the carrying on of the operations of the government may be seriously embarrassed or wholly arrested. Even though it be true that the officer, by making the defense in the state court, can ultimately obtain the protection of the laws of the United States, the injurious effect in the way of impeding the enforcement of the laws of the United States would not be obviated, for, as is pointed out by the supreme court in Tennessee v. Davis, supra, [100 U. S. 257, 25 L. Ed. 648], during the time the officer is under arrest or is engaged in defending himself in the state court he is withdrawn from the discharge of his duty, and the exercise of acknowledged federal power is arrested. Hence the justification of the true rule that it cannot be permitted to the state to assert jurisdiction over one acting under the authority of the United States for acts by him done in furtherance of the duty he owes to the federal government, upon the assumption that these acts are violations of a state statute."

In this case, these men, who are in the army, and who, for aught we know, may be called upon any day to go to the Texan border, if held by the state authorities, may not be able to accompany their regiment and discharge the patriotic duties they owe to their country. Their time would have to be given to the defense of their cases. They might be detained by some action of the court, and, if that may be done with one member of the army of the United States, it could be done with another. If it could be done in times like this, when men are subject to call and probably will have to answer the command to go, it could be done even in more dangerous times. There is no denial of any right. If these men have done a wrong, the military establishment of the United States is able to punish them. If it does not, it does not necessarily follow that at a proper time—and it seems to me this was a very inopportune time to arrest these men—the parties in interest may not be without their remedy.

The petitioners are discharged, and an order may be taken accordingly.